1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

11                                                          Case No. C10-1562RSL

              Plaintiff,

12                                                          ORDER DENYING DEFENDANT'S
                                                            MOTION FOR PARTIAL
13      v.                                                  SUMMARY JUDGMENT

14   FRY'S ELECTRONICS, INC.,

15              Defendant.

16          This matter comes before the Court on "Fry's Motion for Summary Judgment on

17   the Sexual Harassment Claim Asserted by EEOC on Behalf of America Rios." Dkt.

18   # 162.  On September 29, 2010, the Equal Employment Opportunity Commission

19   ("EEOC") filed a complaint on behalf of Ka Lam and America Rios[1] alleging that

20   defendant Fry's Electronics, Inc., engaged in unlawful employment practices in violation

21   of Title VII of the Civil Rights Act of 1964.  Dkt. # 1 at 3-4.  The EEOC alleges that

22   defendant (1) subjected Ms. Rios to a hostile work environment because of her sex and

23

24          [1] Mr. Lam was granted leave to intervene as a plaintiff in this matter on February 14,
25   2011.  Dkt. # 44.  The Court denied Ms. Rios's request to intervene because she failed to file a
     timely administrative charge with the EEOC and her claim did not meet the requirements of the
26   "single filing rule."  Dkt. # 47 at 8.

ORDER DENYING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 1

(2) fired Mr. Lam in retaliation for reporting the sexual harassment of Ms. Rios.  Id.

Defendant seeks summary judgment on the sexual harassment claim because (1) Ms. Rios

failed to exhaust administrative remedies and her claim is untimely and (2) she did not

experience a hostile work environment altering the conditions of her employment.

Summary judgment is appropriate when there is no genuine dispute of material

facts and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. Pro.

56(a).  The moving party bears the initial burden of justifying the basis for its motion

(Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and identifying materials in the

record that show the absence of a genuine dispute of material fact (Fed. R. Civ. P.

56(c)(1)).  A genuine dispute of material fact arises when there "is enough [evidence] 'to

require a jury or judge to resolve the parties' differing versions of the truth at trial.'"

Aydin Corp. v. Loral Corp., 718 F.2d 897, 902 (9th Cir. 1983) (quoting First Nat'l Bank

v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)).  In making this determination, a court

"must draw all reasonable inferences supported by the evidence in favor of the non-

moving party."  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).

If the moving party meets its initial burden, then the non-moving party must

designate, from evidence in the record, "specific facts showing that there is a genuine

issue for trial."  Celotex, 477 U.S. at 324.  Production of a "mere . . . scintilla of

evidence" is not sufficient to prevent summary judgment.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 252 (1986).  Rather, "there must be evidence on which the jury could

reasonably find for the [non-moving party]."  Id.

Having considered the pleadings, declarations, and exhibits submitted by the

ORDER DENYING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 2

parties,[2] and taking the evidence in the light most favorable to the EEOC, the Court finds as follows:

## FACTUAL BACKGROUND

Defendant operates thirty-four retail electronic stores located nationwide and has its home offices in San Jose, California. Motion (Dkt. # 162) at 2. In July of 2005, defendant hired Ms. Rios as a customer service associate in its Renton, Washington store. Response (Dkt. # 172) at 1. Between late 2006 and February 2008, Art Squires served as the Renton Store Manager, Minasse Ibrahim as the Assistant Store Manager, and Duc Le as the Manager of the Audio Visual (hereinafter "A/V") Department. Dkt. # 162 at 2. Kathy Kolder, one of the four Fry's founders, acted as the Executive Vice President. Id. at 2–3. Lisa Souza was employed as the Manager of Enterprise Risk Management. Id. at 2–3. Ms. Kolder and Ms. Souza worked from the Home Office in San Jose. Id. at 3.

**A. Defendant's Sexual Harassment Policy**

The "Associate Handbook & Safety Manual" (hereinafter "employee handbook") contains defendant's "open door policy" for dealing with sexual harassment claims and other employee concerns. Dkt. # 163-1 at 40–42. Defendant asserts that "[a]ll managers and associates are trained on [the policies set forth in the employee handbook] when hired" and receive a copy of the handbook during training. Dkt. # 162 at 3. Defendant's

---

[2] The Court finds that this matter can be decided on the papers submitted. Defendant's request for oral argument is, therefore, DENIED.

This Order was substantially completed by the time plaintiff filed its "Motion to Supplement the Record" (Dkt. # 205) and defendant filed its "Motion Under CR 7(d)(2) for Relief from Deadline to Submit Material" (Dkt. # 207). The Court has reviewed these supplemental submissions (a) in the context of the pending motion for summary judgment and (b) in an effort to ensure that the truth-finding mission of this tribunal has not been compromised. The motions to supplement the record are, therefore, GRANTED.

"open door policy" states, in part:

> We encourage you to bring your problems to your Supervisor or any other
> member of management whom you feel can help you.  We, in turn, promise
> to listen to your concerns with respect and do our best to solve your
> problems.  If the issue you have directly involves your Supervisor, you may
> go directly to your Department Manager.  If the issue is with your
> Department or Store / Asst. Store Manager, you may go directly to your
> Department Director.  Any member of management is available to help you
> resolve any issues you may have.

Dkt. # 163-1 at 41.  Defendant's "open door policy" includes providing employees access

to "Tell Randy" forms.  Id. at 42.  Employees may use these forms "[i]f [they] are not

comfortable speaking with [their] store management, or are not satisfied with the results

after speaking with them . . . ."  Id.  Completed forms may be faxed to President Randy

Fry.  Id. at 42.  Defendant also asserts that "the company maintains an anonymous hotline

that associates may use to lodge any form of concern or complaint but are reluctant to

approach management directly."[3]  Dkt. # 162 at 3.

The employee handbook states that defendant is committed "to providing a work

environment free of unlawful discrimination and harassment."  Dkt. # 163-1 at 43.  The

handbook also describes the process for reporting harassment:

> If you believe you, or a co-worker, has been harassed, please speak to
> and/or provide a written complaint to your Store / Asst. Store Manager as
> soon as possible after the incident.  If you are not comfortable with this
> course of action, you should speak with and/or provide a written complaint
> to the Benefits Services Dept., Dept. District Manger, or your Department
> Director, as soon as possible after the incident.  The complaint should
> include details of the incident, names of the individuals involved, and
> names of witnesses.  An Associate Harassment Complaint Report form is
> available from the Store / Asst. Store Manager, or in the Forms Center at

---

[3] The employee handbook excerpts provided to the Court make no mention of an
anonymous hotline.  However, several witnesses mentioned the existence of such a hotline in
their deposition testimony.  See, e.g., Dkt. # 163, Ex. 1 at 87–88; Dkt. #  175, Ex. 1 at 19–20.

the Home Office, to aid you in writing your complaint.

Id. at 43.  Defendant promises "[a] prompt, thorough, and objective investigation of the allegations . . . ." Id.  Defendant's policies strictly prohibit retaliation against employees for reporting harassment.[4] Id. at 41-44.  According to defendant, if an employee complains about harassment to the Benefits Services Department,[5] then "typically Benefits Services works with the Store Manager to investigate the matter unless there is a good reason [the Store Manger] should not be the investigator (such as if the Store Manager is accused)."  Dkt. # 162 at 3-4.

**B. Alleged Sexual Harassment of Ms. Rios**

Ms. Rios began her employment with defendant in the customer service department as a cashier, transferred to returns in 2006, then moved to the A/V department in 2007.  Dkt # 163-2 at 8.  On two occasions, defendant selected Ms. Rios as an "A-Team" member.  Dkt. # 175-1 at 8.  "A-Team" members assist in training new employees and opening new stores.  Id.  Management selects higher performing employees to serve as "A-Team" members.  Id.

Soon after Ms. Rios's transfer to the returns department, Assistant Store Manager

---

[4] The handbook states in relevant parts:
• "Fry's does not allow any form of retaliation against any associate who has expressed their concerns, opinions and/or observations," Dkt. # 163, Ex. 1 at 41;
• "If [an employee who reports harassment or other concerns] is retaliated against by their Supervisor, Department Manager, or Director, or any other member of upper manager, the individual retaliating will be subject to severe disciplinary action, up to and including termination," Id., Ex. 1 at 42;
• "Fry's wants to repeat that it will not tolerate any retaliation against [employees] for expressing [their] ideas or concerns," Id., Ex. 1 at 42; and
• "Fry's will not retaliate against an associate for filing a good faith [harassment] complaint, and will not tolerate or permit retaliation by management, associates, or co-workers," Id., Ex. 1 at 44.

[5] Defendant's Benefits Services Department acts as the company's human resources department.  Dkt. # 162 at 3–4.

ORDER DENYING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 5

Minasse Ibrahim began sending her "text messages in a sexual way, referring to [her] breasts; always wanting to hang out with [her] late at night; always had drinking involved. He'd look at [her] up and down by – like just make you feel uncomfortable . . . ." Dkt. # 175-1 at 10. From Ms. Rios' perspective, all of Mr. Ibrahim's text messages were sexually harassing and unwanted. Id. at 14-15.

After Ms. Rios transferred to the A/V department in 2007, the sexually harassing behavior and text messages continued. Mr. Ibrahim would comment on how Ms. Rios looked on a particular day and/or proposition her. For example, Ms. Rios received a text message telling her "you look sexy today, and why don't you come over to my house and bring those two . . . ." Dkt. # 175-1 at 15-16. When she asked to what he was referring, Mr. Ibrahim "looked at [Ms. Rios] up and down and just kind of like stopped at [her] breasts and said like those." Id. at 17. Ms. Rios was unable to put a number on the text messages she received from Mr. Ibrahim, simply stating, "too many to count." Id. at 14.[6] Mr. Ibrahim also touched Ms. Rios' shoulder on one occasion in a manner she described as "groping" and found offensive. Dkt. # 175-2 at 2-3.[7] She told him not to touch her again and he did not. Id. at 3. Her requests that Mr. Ibrahim stop sending her text messages were not heeded, however. Dkt. # 175-1 at 11, 17-18, 24-25.

Ms. Rios complained about Mr. Ibrahim's behavior to Mr. Lam, her A/V

---

[6] Ms. Rios no longer has any of the text messages she received from Mr. Ibrahim. At her deposition, Ms. Rios explained, "I kept them for as long as I could, and then, once I got fired and nobody helped me and nobody listened to me or – or wanted to understand what I was going through, I just no longer had them anymore." Dkt. # 175-1 at 18.

[7] When Ms. Rios first described this contact during an interview with the EEOC investigator, she stated that Mr. Ibrahim "never touched me inappropriately." Dkt. # 163-2 at 82. She did, however, object to the contact and the evidence has been stated in the light most favorable to the EEOC.

ORDER DENYING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 6

Department Supervisor, in April or May 2007.[8]  Ms. Rios showed him two text messages she had received from Mr. Ibrahim.  The messages confirmed Mr. Lam's fears regarding the existence of sexual harassment in the Renton store and he felt it was a "call to action." Dkt. # 163-1 at 85.  In a May 2007 email to the EEOC, Ms. Rios described the content of the two text messages as follows:

> [O]ne day around [the] end of April, I got a message from [Mr. Ibrahim] saying "wow you look very nice today" then another message right after "how about I bring the drinks and you bring those 2 (referring to my boobs).  At that moment I knew this went out of hand.[9]

Dkt. # 163-2 at 75.[10]

Mr. Rios also reported Mr. Ibrahim's behavior to Mr. Le, her A/V Department Manager, and showed him two of the text messages she received.  Dkt. # 163-2 at 30-32. Mr. Le described one of Mr. Ibrahim's text messages as "something along the lines of [Mr. Ibrahim] asking [Ms. Rios] out on a date."  Dkt. # 175-3 at 7.  Although Mr. Le

---

[8] Ms. Rios testified that she first reported the alleged sexual harassment to "Jacob."  Dkt. # 175-1 at 19, 23.  In her April 18, 2010, interview with Bill Benedict, an investigator for the EEOC, Ms. Rios states that she talked with a "Jacob Bunts" after complaining to Mr. Lam about ongoing sexual harassment.  Dkt. # 163-2 at 82.  According to the interview record, Ms. Rios stated that Mr. Bunts "was a good friend" and "is in Chicago now working for [defendant]."  Id. Ms. Rios reported that Mr. Bunts told her "the same thing [Mr. Lam] did.  Call the hotline."  Id. The evidence fails to clarify Mr. Bunts's job title at the time Ms. Rios approached him about Mr. Ibrahim's behavior.

[9] In her deposition, Ms. Rios testified, "The I look sexy and the breast [comments] are all in one [text message], and the second [text message] would be that – to like not end my night short and to come over.  It was always come over and drink with him."  Dkt. # 175-2 at 2.

[10] Although defendant argues that Ms. Rios has failed to "articulate the substance of any other alleged text messages" (Dkt. # 162 at 4 (emphasis in original)), this is not entirely accurate. While Ms. Rios struggled in her deposition to recall the exact wording of other text messages, she testified that, "I would receive text messages in a sexual way, referring to my breasts; always wanting to hang out with me late at night; always drinking involved."  Dkt. # 175-1 at 10.  Ms. Rios also asserts that when she "was hanging out with [other Fry's employees, Ibrahim would text her saying that she] shouldn't end the night shortly and just come to his house, even when it was like two or three at night or in the morning."  Id. at 12.

could not recall any further detail regarding the message, the "first thing that [came] into [Mr. Le's] mind" when Store Manager Art Squires told Mr. Le that he was conducting a sexual harassment investigation was the text message Mr. Ibrahim had sent to Ms. Rios. Id. at 7-9.

Mr. Le recommended that Ms. Rios report the text messages to Mr. Squires. Id. at 11. When Ms. Rios told him she felt "uncomfortable with that," Mr. Le "told her . . . that we could [use] the silent witness hotline." Id. Mr. Lam also approached Mr. Le about the text messages. Dkt. # 163-2 at 65. When Mr. Lam informed Mr. Le that he was going to contact the Home Office in San Jose rather than go through Mr. Squires, Mr. Le "told him that was an option that he had, because that's why we have the silent witness hotline: If you do not want to talk to the store manager, want to talk to someone higher." Id. at 69. Mr. Le took no further action to investigate or report Ms. Rios's sexual harassment complaint until approached by Mr. Squires during the internal investigation. Dkt. # 175-3 at 4-5

Mr. Lam, Ms. Rios, and Mr. Le were all concerned about reporting the alleged conduct to the Store Manager because Mr. Squires and Mr. Ibrahim "are close friends, and this is pretty serious stuff." Dkt. # 175-7 at 11. In early May 2007, Mr. Lam called defendant's Home Office to report Ms. Rios's complaint. He spoke with the Director of Risk Management, Lisa Souza. Ms. Souza told Mr. Lam that she would relay his message to Executive Vice President Kathy Kolder.[11] Dkt. # 175-4 at 5. Around the same time that Mr. Lam called the Home Office, Ms. Rios called the "silent witness hotline" to report the sexual harassment. Dkt. # 175-1 at 19-20.

---

[11] According to Ms. Souza, Mr. Lam simply stated that he wanted to talk to Ms. Kolder and provided his name, position at the Renton store, and phone number. Dkt. # 175-4 at 5.

**C.  Defendant's Investigation of Sexual Harassment Complaint**

When Ms. Kolder learned that there was an allegation of sexual harassment arising out of the Renton store, she directed Mr. Squires to investigate.[12]  Dkt. # 162 at 5–6.  Mr. Squires testified that while he was in San Jose at defendant's May quarterly meeting, Ms. Kolder told him "that [his] assistant store manager, Minasse, had harassed . . . a female associate."[13]  Dkt. # 175-4 at 15.  Ms. Kolder also informed Mr. Squires that Mr. Lam had forwarded the complaint.  Id.  Ms. Kolder "told [Mr. Squires] to go back to the store and find out what's going on . . . ."  Dkt. # 163-1 at 65.  According to Mr. Squires, the "benefit service team . . told [him] to get statements and things like that."  Id. at 66.  One or two days after his discussion with Ms. Kolder at the quarterly meeting, Mr. Squires returned to the Renton store and began the investigation.  Dkt. # 162 at 6.

**1.  Interview of Mr. Lam**

Shortly after Mr. Squires returned from San Jose, he called Mr. Lam into his office and told him that someone from the Renton store had complained about sexual harassment.  Although Mr. Squires announced that he would be conducting an investigation of the complaint, he did not question Mr. Lam regarding his knowledge of events or Ms. Rios' situation.  Dkt. # 175-7 at 15-16.  Rather, Mr. Squires admonished Mr. Lam to treat the assistant store manager with respect and made some rather pointed

---

[12] There is a factual dispute regarding who informed Ms. Kolder of the sexual harassment complaint.  Ms. Rios testified that she spoke directly to Ms. Kolder about the allegations.  Dkt. # 175-1 at 20.  Ms. Kolder, on the other hand, says that she "didn't speak with Mr. Lam or Ms. Rios about the complaint."  Dkt. # 183 at 90.  Ms. Kolder could not, however, recall how she learned of the complaint or how much information she had when she directed Mr. Squires to investigate.  Dkt. # 163-1 at 15-16.

[13] Mr. Squires testified that he could not remember whether Ms. Kolder specifically mentioned Ms. Rios' name when informing him about the sexual harassment complaints.  Dkt. # 175, Ex. 4 at 15.

comments regarding Mr. Lam's job performance:

> And then he go on about like at the same – he carry on, and he say that my performance hasn't been up to par as of late. And then, you know, he – that I should really only worry about myself and focus on my job. And, you know, I need to make sure to get my performance up because it's down. and then, yeah, pretty much say also – I believe he also say in his word that you should worry about your performance. I'm not – that some change is going to happen. I'm not saying I'm going to fire you now, but you should only worry about your – you should worry about like your performance, and you should worry about your job and your job only.

Dkt. # 175-7 at 15 (grammatical errors in original).

### 2. Interview of Ms. Rios

Ms. Rios states that, although Mr. Squires "did most of the talking" during her interview, she was able to tell him about Mr. Ibrahim's harassing conduct. Dkt. # 175-1 at 21. Mr. Squires took the opportunity to tell Ms. Rios that she had recently performed poorly during two "secret shops"[14] and that "years before, when [employees were] having unproductive conversations, he . . . fired a bunch of people and isn't afraid to do it again . . . ." Id. Mr. Squires asked Ms. Rios if Mr. Lam were responsible for the sexual harassment, to which she responded, "'No. It's Minasse [Ibrahim]." Id.

Mr. Squires recalls a very different conversation with Ms. Rios. Although his testimony is not entirely clear, he suggests that Ms. Rios complained about receiving harassing text messages from Mr. Lam, not Mr. Ibrahim. Dkt. # 175-4 at 22. Ms. Rios denies that Mr. Lam ever sent her text messages that made her feel uncomfortable. Dkt. # 175-2 at 8.

_____

[14] "Secret shops" are a type of employee evaluation where " a person paid to pose as a customer comes to the store and later reviews his or her customer experience." Dkt. # 172 at 5 n.2.

ORDER DENYING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 10

### 3.  Interviews of Mr. Le

The record indicates that on at least two separate occasions Mr. Squires discussed Ms. Rios' sexual harassment complaint with Mr. Le.  In one discussion, "[Mr. Squires] informed [Mr. Le] that he was investigating a sexual harassment case in [Mr. Le's] department."  Dkt. # 175-3 at 6.  Although Mr. Squires did not mention any names, "[Mr. Le] told him that . . . it might have been [Mr. Ibrahim]."  Dkt. # 175-3 at 7.  Mr. Le told Mr. Squires that he had seen one of the text messages that Ms. Rios had received from Mr. Ibrahim.  Id.  Mr. Squires does not remember Mr. Le ever telling him that Mr. Ibrahim was harassing Ms. Rios.  Dkt. # 163-1 at 62–63.

In the second discussion, Mr. Le told Mr. Squires that Mr. Lam was behaving inappropriately toward Ms. Rios.  Mr. Le states that Ms. Rios complained to him "that . . . Lam . . . had feelings for her and it was unwanted."  Dkt. # 163-2 at 70.  Mr. Le explained, "[T]his time I actually did talk to . . . Squires about [the alleged sexual harassment of Rios] because I was concerned that there was more than just one person in my department [harassing Rios]."[15]  Id. at 71.

### 4.  Meeting Between Ms. Rios, Mr. Le, "Xuan," and Mr. Squires

At some point during the investigation, Mr. Squires held a meeting with Ms. Rios, Mr. Le, and a person named "Xuan."  Dkt. # 175-2 at 6-7.  At the time of this meeting, Ms. Rios still had the offending text messages from Mr. Ibrahim on her phone.  Id. at 6.  Mr. Squires did not request to see the text messages during the investigation.  Id. at 6.[16]

---

[15] On the same day that Mr. Lam was suspended, Mr. Squires asked Mr. Le to write a statement memorializing Ms. Rios' alleged sexual harassment complaint against Mr. Lam.  Dkt. # 175-3 at 13-16.

[16]  Mr. Squires could not recall if he ever asked to view the text messages.  Dkt. # 175-4 at 23.

Although this meeting lasted about one hour and took place in Squires's office, Dkt. # 175-2 at 7, the record provides very little detail regarding what transpired.

**5.  Interview of Mr. Ibrahim**

When Mr. Squires questioned Mr. Ibrahim about Ms. Rios' complaints of sexual harassment, Mr. Ibrahim denied all allegations.  Dkt. # 163-3 at 9.  Mr. Ibrahim submitted a written statement where he declared, "I have never harassed any one in my whole life." Id. at 16.

**6.  Records Related to Investigation**

Mr. Squires could not recall taking any notes documenting the interviews he conducted while investigating Ms. Rios' complaint of sexual harassment.  Dkt. # 175-4 at 20-21.  Mr. Squires did not complete a "Harassment and Discrimination Complaint Confidential Investigation Report" form even though he had completed such a report in the context of other investigations.  Dkt. # 175-4 at 17-19.

**7.  Ms. Rios' May 2007 Draft Letters**

Ms. Rios drafted two letters, apparently with the help of her mother, on May 22 and 23, 2007.  Dkt. # 175-7 at 26-29.  The letters recount Mr. Ibrahim's sexually harassing activities.  Although Ms. Rios intended to finalize the letter and send it to Ms. Kolder, Dkt # 163-2 at 22-24, she decided against it when Mr. Lam was fired and she became scared that she would be next, Dkt. # 175-2 at 13.

**D.  Continued Harassment of Ms. Rios**

Ms. Rios states that, prior to reporting the sexual harassment to defendant's upper management, she confronted Mr. Ibrahim about the text messages and "told him . . . to stop and that I just didn't like it."  Dkt. # 175-1 at 17.  Nevertheless, Mr. Ibrahim sent her two more harassing text messages, Dkt. # 175-1 at 25, and continued to leer and stare at

her in a sexual manner.  Dkt. # 175-2 at 1.  The harassment continued until her

termination.  Dkt. # 175-2 at 4-5.

**E.  Defendant Fires Ms. Lam and Ms. Rios**

On May 22, 2007, Ms. Rios contacted A/V District Manager Kevin Karst and

asked if he were aware of her sexual harassment complaint.  Dkt. # 175-1 at 21-22.  Mr.

Karst had no knowledge of the complaint.  Dkt. # 175-7 at 27.  Two days later, defendant

placed Mr. Lam on a five-day suspension and subsequently terminated his employment.

Dkt. # 175-3 at 17-18.

Defendant fired Ms. Rios less than a year later, on February 14, 2008.  Dkt. # 175-

6 at 11.  The "Involuntary Termination Request" states that the reason for the termination

was "[u]nsatisfactory job performance by failing to meet sales expectations."  Id.  Mr. Le

and Mr. Ibrahim signed the termination request form.[17]  Id.  Ms. Rios acknowledges that

her sales performance declined prior to her termination, but attributes her drop in sales to

the ongoing sexual harassment by Mr. Ibrahim.  Dkt. # 163-2 at 82.

**F.  Brief Procedural History**

Mr. Lam filed a charge with the EEOC on October 5, 2007, alleging that defendant

retaliated against him for reporting Ms. Rios' sexual harassment complaint.  Dkt. # 162

at 9.  Between October 2007 and August 2010, the EEOC undertook a number of

administrative actions, including reopening the investigation, rescinding two separate

cause findings, and making multiple conciliation demands.  Id. at 9-10.  On August 10,

2010, the EEOC issued a "Notice of Intent to Find Cause," which, for the first time,

alleged that Ms. Rios "was also subjected to retaliation for protected activity as well as

_____

[17]  The form is also signed by the "President/Exec. V.P.," the "Benefit Associate, Inputting," and the "Benefits Services Supervisor."  Dkt. # 175-6 at 11.  The signature on all three lines appears to be the same, but is illegible.

ORDER DENYING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 13

sexual harassment." Dkt. # 163-3 at 51.  The EEOC demanded conciliation on behalf of

both Mr. Lam and Ms. Rios on August 23, 2010.  Dkt. # 163-3 at 59.  When conciliation

proved unsuccessful, the EEOC instituted this action against defendant on September 29,

2010.  Dkt. # 1.  The EEOC alleges that defendant subjected Ms. Rios to a hostile work

environment because of her sex.  Dkt. # 1 at 2.

**DISCUSSION**

Defendant seeks dismissal of the claim brought on behalf of Ms. Rios on the

grounds that (1) the EEOC failed to follow required procedures and the claim is untimely,

and (2) the undisputed evidence shows that Ms. Rios did not endure a sufficiently hostile

work environment to affect the terms and conditions of her employment.

**A. Plaintiff Properly Added the Claim on Behalf of Ms. Rios During the Course of Investigation Mr. Lam's Charge**

When Ms. Rios sought to intervene in this action, the Court found that she had

failed to exhaust her administrative remedies and therefore did not have an unconditional

right to intervene under 42 U.S.C. § 2000e-5(f)(1).  In addition, the Court found that the

discriminatory conduct Ms. Rios alleged was not "nearly identical" or even substantially

similar to that alleged by Mr. Lam, making the "single-filing" exception inapplicable.

Dkt. # 47.  Thus, Ms. Rios could not intervene to pursue her claims on her own behalf.

Defendant argues that the same analysis should preclude the EEOC from seeking relief on

Ms. Rios' behalf.

The procedural limitations that apply to private claims do not necessarily apply to

the government agency tasked with enforcing Title VII of the Civil Rights Act of 1964.

See 29 C.F.R. § 1601.1.  Established Ninth Circuit precedent "allow[s] the EEOC to

litigate allegations of different types of discrimination discovered during investigations of

ORDER DENYING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 14

other charges of discrimination." <u>Lucky Stores, Inc. v. EEOC.</u>, 714 F.2d 911, 912 (9th Cir. 1983). The EEOC is authorized to bring suit on behalf of individuals who did not file a charge if it discovers other violations during the course of a "reasonable investigation" into a valid charge. <u>EEOC v. Occidental Life Ins. Co. of Am.</u>, 535 F.2d 533, 541-42 (9th Cir. 1976). A "reasonable investigation" is one that provides the respondent-employer with adequate notice of the additional claim, determines reasonable cause exists to support the new claim, and adheres to the statutorily-prescribed conciliation procedures. <u>See</u> <u>Lucky Stores</u>, 714 F.2d at 912; <u>Occidental Life</u>, 535 F.2d at 541–42 (adopting the reasoning of the Fourth, Fifth, and Sixth Circuits); <u>EEOC v. Hearst Corp., Seattle Post-Intelligencer Div.</u>, 553 F.2d 579, 581 (9th Cir. 1976) ; <u>EEOC v. Gen. Elec. Co.</u>, 532 F.2d 359, 366 (4th Cir. 1976).

Here, the EEOC provided defendant with the statutorily-required notice that it was adding a claim on behalf of Ms. Rios, found reasonable cause supporting the new claim, and made a conciliation demand. This is sufficient under governing Ninth Circuit precedent[18] and, as Judge Posner has articulated, requiring anything more would impede the agency's ability to enforce Title VII:

> [E]xhaustion of administrative remedies is an issue when the suit is brought by a private party but not when the Commission is the plaintiff. Were the private party permitted to add claims that had not been presented in the administrative charge filed with the EEOC, the Commission's informal procedures for resolving discrimination charges would be by-passed, in derogation of the statutory scheme. That is not an issue when the EEOC itself is the plaintiff, which is why a suit by the EEOC is not confined "to claims typified by

---

[18] Defendant fails to cite any case that precludes the EEOC from providing notice, finding cause, and pursuing conciliation for Title VII violations discovered during the investigation of an original charge. Defendant's reliance on <u>EEOC  v. Pierce Packing Co.</u>, 669 F.2d 605 (9th Cir. 1982), is misplaced. That case stands for the proposition that the EEOC cannot use a separate sex discrimination settlement agreement with the employer as a substitute for the independent investigation, reasonable cause determination, and conciliation efforts required by Title VII. 669 F.2d at 607–08.

those of the charging party," and why [the respondent-employer] is mistaken to think that the EEOC's complaint must be closely related to the charge that kicked off the Commission's investigation.  "Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable."  The charge incites the investigation, but if the investigation turns up additional violations the Commission can add them to its suit.

EEOC v. Caterpillar, Inc., 409 F.3d 831, 832–33 (7th Cir. 2005) (citations omitted) (quoting

General Telephone Co. of the Northwest, Inc. V. EEOC, 446 U.S. 318, 320, 331 (1980) (holding

that the EEOC did not have to comply with Fed. R. Civ. P. 23 when pursuing relief on behalf of

a class because that approach "is far more consistent with the EEOC's role in the enforcement of

Title VII than is imposing the strictures of Rule 23, which would limit the EEOC action to

claims typified by those of the charging party.")).

The Court finds that, based on the facts and procedural history of this case, the

EEOC may pursue a sexual harassment claim on behalf of Ms. Rios.

**B.  Disputed Facts Foreclose Summary Judgment as to Whether Ms. Rios Experienced Sexual Harassment Sufficiently Severe and Pervasive as to Alter the Conditions of her Employment**

Title VII of the Civil Rights Act of 1964 prohibits employers from engaging in

employment practices that "'discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such an

individual's race, color, religion, sex, or national origin.'"  Meritor Sav. Bank, FSB v.

Vinson, 477 U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e-2(a)(1)).  This prohibition

includes not only "economic or tangible discrimination," but also "sexual harassment that

is so severe or pervasive as to alter the conditions of [the victim's] employment and create

an abusive working environment."  Craig v. M & O Agencies, Inc., 496 F.3d 1047, 1054

(9th Cir. 2007) (alteration in original) (quoting Meritor, 477 U.S. at 67) (internal

quotation marks omitted).

ORDER DENYING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 16

Employer liability for sexual harassment of an employee by her direct supervisor can be established under one of two theories—"quid pro quo" harassment or "hostile work environment" claims.  Id. at 1054 (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998)).  This case involves the latter theory.

Under the hostile work environment theory, an employee "must show 'that: (1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. at 1055 (quoting Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir. 1995)).  The employee must establish that the working environment was "'both subjectively and objectively" abusive.  Id.  (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 20–21 (1993)).

A finding of objective hostility requires a court to "examin[e] the totality of the circumstances and [determine] whether a reasonable person with the same characteristics as the victim would perceive the workplace as hostile."  Id. (quoting Harris, 510 U.S. at 20–21); see also Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991) ("[I]n evaluating the severity and pervasiveness of sexual harassment, we should focus on the perspective of the victim.").  To be cognizable under Title VII, "'conduct must be extreme to amount to a change in the terms and conditions of employment.'"  Craig, 496 F.3d at 1055 (quoting Faragher, 524 U.S. at 788).  "However, even if a hostile working environment exists, an employer is only liable for failing to remedy harassment of which it knows or should know."  Fuller, 47 F.3d at 1527 (citing Ellison, 924 F.2d at 881).

The EEOC's claim on behalf of Ms. Rios satisfies the first two elements of a

hostile work environment claim.  Plaintiff alleges that Ms. Rios' supervisor sent her multiple text messages containing unwanted sexual comments and overtures.  There is also evidence that Mr. Ibrahim leered and stared at Ms. Rios in a way that made her uncomfortable and, on one occasion, touched her shoulder in a groping and unwelcome manner.  The issue, then, is whether the EEOC has presented evidence " which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."  Ellison, 924 F.2d at 879.

In assessing the totality of the circumstances to determine whether a person experienced a hostile work environment, a court should consider "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Dominquez-Curry v. Nev. Transp. Dept., 424 F.3d 1027, 1034 (9th Cir. 2005) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)). While "isolated incidents of sexual horseplay," Candelore v. Clark Cnty. Sanitation Dist., 975 F.2d 588, 590 (9th Cir. 1992) and "off-color jokes," Jordan v. Clark, 847 F.2d 1368, 1375 (9th Cir. 1988), alone may fail to alter workplace conditions, the Ninth Circuit has "repeatedly held that sexual-based conduct that is abusive, humiliating or threatening is sufficient to make a prima facie claim under Title VII . . . ." Craig, 496 F.3d at 1056 (citing Ellison, 924 F.2d at 873; Steiner v. Showboat Operating Co., 25 F.3d 1459, 1461–63 (9th Cir. 1994); Fuller, 47 F.3d at 1522, 1527-28).

In Craig v. M & O Agencies, Inc., the court found a hostile work environment existed where an employee's supervisor made repeated inappropriate comments about her body and clothing, asked her "if she had ever thought of making love to him," and walked into the women's restroom and "approached her, grabbed her arms, 'gave her an open-

mouthed kiss and stuck his tongue in her mouth.'" 496 F.3d at 1051-52 (quoting the record).  The harassing behavior in <u>Craig</u> occurred over a period of months.  <u>Id.</u> at 1056. In <u>Ellison v. Brady</u>, the court reversed a district court's grant of summary judgement for the employer.  The court held that an employee's allegation that she had received disturbing love letters from a co-worker stated a *prima facie* case of work place discrimination under Title VII.  924 F.2d at 873–75, 884.

There are few, if any, undisputed facts in this case regarding the alleged harassment of Ms. Rios.  Taking the evidence in the light most favorable to the EEOC, one could conclude that Ms. Rios received numerous text messages of a sexual nature from Mr. Ibrahim over the course of approximately two years.  When she had finally had enough, she asked Mr. Ibrahim to stop.  He did not.  When she complained to her supervisors at various levels, the reaction was mixed, but decidedly unhelpful.  Some supervisors referred her to other resources and took no steps to investigate or remedy the situation.  Another attempted to intervene and was fired.  During the investigation of her complaint, the store manager took the opportunity to tell Ms. Rios that her performance was lacking and that "unproductive communications" could get you fired.  "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness of the conduct."  <u>Ellison</u>, 924 F.2d at 1991.  <u>See</u> <u>also</u> <u>Davis v. Team Elec. Co.</u>, 520 F.3d 1080, 1096 (9th Cir. 2008) (reversing a district court's grant of summary judgment to an defendant-employer in a Title VII sexual discrimination case because "[a]lthough the incidents fall far short of physical abuse or aggressive sexual advances . . . . the conduct occurred repeatedly over the course of [the plaintiff's] employment" lasting approximately sixteen months).  Ms. Rios states that the ongoing sexual harassment adversely impacted her work performance.

While defendant disputes these facts, the EEOC has presented sufficient evidence from which a reasonable fact finder could conclude that the frequency of the discriminatory conduct, its humiliating nature, and its adverse impact on Ms. Rios' performance altered the conditions of employment and created an abusive working environment.  A fact finder must "resolve the parties' differing versions of the truth at trial."  Aydin Corp., 718 F.2d at 902 (quoting First Nat'l Bank, 391 U.S. at 288-89).

**C. Defendant's Spoliation and Faragher/Ellerth Arguments**

In reply, defendant argues that Ms. Rios spoliated the text messages she received from Mr. Ibrahim and argues that it cannot be held responsible for Mr. Ibrahim's conduct under Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  Because these arguments were raised for the first time after the EEOC had filed its opposition to the motion, plaintiff was deprived of its opportunity to respond.  The arguments are, therefore, rejected as untimely raised. Even if the Court were to consider them on their merits, defendant has not shown that any sanctions related to the destruction of the text messages would be appropriate or that defendant reasonably and effectively responded to the hostile work environment when Ms. Rios complained to numerous supervisory employees.

**CONCLUSION**

For all the foregoing reasons, defendant's motion for summary judgment on the sexual harassment claim asserted on behalf of Ms. Rios (Dkt. # 162) is DENIED. Plaintiff's "Motion to Supplement the Record" (Dkt. # 205) and defendant's "Motion Under CR 7(d)(2) for Relief from Deadline" (Dkt. # 207) are GRANTED.

Dated this 11th day of June, 2012.

*MW S Lasnik*

Robert S. Lasnik
United States District Judge

ORDER DENYING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 21